Good morning. May it please the Court. Michael Shepard for the defendant appellant Tommy Hart. I too would like to reserve a couple minutes for rebuttal. I appreciate both the government's consent and the Court's advancing the argument due to Mr. Hart's poor health. This case presents a very important test of the protections supplied by the Fourth Amendment in its ultimate sanctuary, a person's home. None of the ways the government asks the Court to carve up those protections come close to passing muster. The Fourth Amendment should apply to Mr. Hart in this case as well as to other residents of public housing. There are, I think, three undisputed facts that by themselves establish that the PPS officers who conducted the search and seizure in this case are governed by the Fourth Amendment. The first is that the officers were hired by a public agency. The second is that they worked on public property. And the third is that they were engaged in the quintessential traditional police function of, in the words of Sergeant Carolina, conducting patrols, observing crimes, acting on crimes by placing people under arrest. Let's say we agree with you. What's the problem with what they did? I mean, it seems to me that, first of all, your client was a person not known to them. They knew the people on the property, people who weren't living there weren't supposed to be there. Firearms are prohibited on the property. This was shortly after a report came in that shots were fired and your client turned around and ran when he saw them. They didn't know all the people on the property. They don't claim to know all the people on the property. They didn't know him as a resident. Correct. But if not, if the police not knowing someone is a sufficient exigent circumstance. It's part of the totality of the circumstances. Yes, it is. But there is nothing really to the totality of these circumstances. What did he do when he saw them? What he did when he saw them depends on which testimony you take. But basically, he was standing having a peaceful conversation. Two of the three officers emerged from the car. One shouted gun. The other drew his gun and they chased after him. They saw a gun protruding from his pants. One of the three said they saw that. Was anybody allowed to have a gun in that area? No. No. And so what did he do? Well, after they shouted gun and started to chase him, not identifying themselves as police officers, but one extremely large man and another man who drew a gun. He either, depending on whose testimony you accept, which of the two officers, he either walked quickly back toward his apartment or he ran back toward his apartment, fleeing from these two men, one of whom was shouting gun and the other drew a gun on him. They don't know that it's his apartment, do they? They do not know that it is. They just know he's entering one of the apartments. That's correct. But what we do know is that one of the officers said they saw him pull out a key and place it in the door in order to enter. Is there any dispute that he had a gun and they saw it? I do dispute that he had a gun. It was 25 feet to 30 feet in the dark, in the shadows. One of the three officers sees it. But that's not the strongest argument I have. That's not the strongest argument. It's not the strongest argument I have, but I didn't argue it. You're asking us to believe that they just got out of the car without seeing a gun, they yelled gun and started chasing somebody. No. No, that was their testimony. It's not that I don't believe it, but it's not the strongest argument I have. So he either uses a key, according to one of the officers, or by either officer's estimation, he enters very quickly an apartment after midnight in a housing project, which certainly suggests either he's the luckiest man on earth, having gone to a door that just happens to be open in a housing project after midnight, or he knew exactly where he was going and he knew the door was open. That's the best for the prosecution. I think the real evidence is he used a key and got in. So they did know that he belonged where he was going. Even if he belonged where he was going, he's a guy with a gun in an area where you're not allowed to have a gun, and that's part of their job, stop people with guns from infesting these areas. Well, that suggests it was okay for them to chase, at best. The question then is, was it okay for them to do what they then did? Which was knock on the door. Which was surround the door, demand presence, and conduct a seizure under the Fourth Amendment. But one of the seizures was the weapon, right? And the weapon was outside the apartment. It was tossed out, right? He threw it out. The seizure occurred when they surrounded the apartment, and it certainly had occurred by the time that Mr. Hart tried to exit the apartment, Officer Coxon drew a gun on him, and Mr. Hart retreated back into the apartment. That is a classic surrounding drawing gun seizure under the Fourth Amendment under numerous case law. And that all precedes, Your Honor, when Mr. Hart throws the gun out the window. What's the case that says he was seized when they knocked on the door? Well, that goes back to the Mendenhall Hodari D. Brower line, and ultimately the best case for me, post Hodari D. Hodari D. is a chase case. It's not a surrounding somebody in his home case. I don't think it helps the government at all. The best case is Ewalski, the Sixth Circuit case that postdates Hodari D. that deals with surrounding a man's home and says that is a seizure. The district court in Ewalski took the same approach that the district court did in this case, and the Court of Appeals said, no, that's wrong. That was a seizure. And that seizure in this case predates Mr. Hart tossing the gun out the window, and that's why the tossing of the gun out the window needs to be suppressed. Well, try me again on that one. That is, let's assume for the moment that there's a seizure of the person that takes place in surrounding. That's what Ewalski basically says. What then puts a mantle around the weapon when the weapon is tossed out and is no longer within the apartment? That's classic Wong-Sun fruit of the poisonous tree. When the government engages in illegal behavior, unjustified search, seizure, and someone abandons property, that means that it's the fruit of the poisonous tree and is inadmissible. Now, perhaps the court is thinking, okay, if they had surrounded the house and gotten a warrant, done all the right things, they may well have found the gun inside anyway, but that doesn't rescue. Or he might have tossed it out the window in any event. Right. That doesn't rescue them because, as this Court has said, and this isn't cited in our brief because the government didn't argue this issue, but there's a case, the United States v. Riley, 224 F. 3rd, 986, a Ninth Circuit case in 2000, to excuse the failure to obtain a warrant merely because the officers had probable cause and could inevitably have obtained a warrant would completely obviate the warrant requirement of the Fourth Amendment. So they don't get the benefit of inevitable discovery or whatever because they didn't do what they were supposed to do, namely get a warrant. Well, the Uwaltzky case is somewhat different in terms of the evidence that the Court decided was a seizure because in that case the police actually surrounded the house and paraded an armed vehicle in front of it. And that's somewhat different than the situation we have here where you have a fluid situation with people still running around banging on doors. I mean, they hadn't trapped him in the house, which was demonstrated by his fleeing from it. Well, I think they had trapped him in the house. It was certainly demonstrated after he tried to flee and Lieutenant Coxon pulled his weapon and then he retreated into the house. And Lieutenant Coxon testified he wasn't free to leave. Officer Adkins said they had the house surrounded. He was in a position to know they had the house surrounded. He confirmed they did have the house surrounded. Yes, they didn't have an armored vehicle or some of the other things in some of the other cases, but the effect was exactly the same. They had the house surrounded. He was not free to leave. And they showed that with their weapons. Hodari D. was in 91. And then just a year later, the Ninth Circuit in Santa Maria, Hernandez, says the seizure does not occur if, in response to a show of authority, the subject does not yield. In that event, the seizure occurs only when the police physically subdue the subject. What do we do with that holding? Well, two things. One, that's another chase case. It's not a surround case. It's a chase case. And second, I think Iwalski really well answers that with the following image. If they had the guy surrounded and they brought plywood and tapped it up over all the windows and doors so he could not possibly escape, he would not have submitted to authority, but he certainly would have been seized under the Fourth Amendment. So I think that I would distinguish the, I forget the first part of the Hernandez case, on the ground that that is the right approach in a chase case. It's not the right approach, and it's the rejected approach in a surround case. If I'm to reserve any time for rebuttal, I need to stop now. Thank you, Counsel. Good morning. May it please the Court, I'm Douglas Wilson on behalf of the United States. As the Court's questioning has pointed out, this Court can resolve this case simply by answering one of the questions raised by the party's briefs. That question is, was the defendant seized when he threw the gun out the window? Our answer to that question is no. As the Court has pointed out, a seizure requires either a physical seizure or a submission to authority. A show of authority, as Hodari specifically says, is not sufficient. I thought the Supreme Court told us that freedom to leave was the key to the issue of seizure. Was a person reasonably, did a person reasonably feel that he or she was free to leave? Now, if the thing is surrounded, where is the freedom to leave? The gun might have floated out the window, but not hard. Well, you're right, Your Honor, that the Court has frequently alluded to the freedom to leave. Would a reasonable person be free to leave? That's what the Supreme Court has said the test is again and again, right? As the determination of whether a person is in custody, but in Hodari D., which is a case involving a suspect being chased, the Court specifically said that one of two things has to be present in that situation, either a physical seizure of the person or a submission of the person to the authority of the police officers. But you see, if they don't subdue the person in a chase case, then the person takes off again. What happens when he's ensconced in an apartment and all the exits are blocked by official people? Is that freedom to leave? I would agree with Appellant and with Your Honor that there may be situations in which a person is barricaded or is completely surrounded and is therefore seized within the meaning of Hodari D. and other cases from the Supreme Court. But that's not this case. As Judge Trott pointed out, this was a fluid situation. When the suspect ran through the apartment and came out the back door. Let's talk about when he came back in, though. Once he came back in, for whatever reason, and the thing is surrounded, was he then seized or not seized? He was not seized, Your Honor. And let me explain the positioning of the officers at that point. At that point, Officer Carolina was at the front door pounding on the door. Officer Coxon had been standing by his car 75 feet away from the back door when the suspect, the defendant, ran out the back. The defendant saw Officer Coxon 75 feet away. And if you look at the picture at ER 365, you'll see how much space there was between the door and the area where Officer Coxon was standing and how much space the defendant had to flee if he wanted to. So he was clearly not seized at that point when he ran out the back door. But I'm asking when he comes back in. Right. So then he goes back in. Officer Coxon testified that he went around to the front because at that point he thought that he should. Well, he saw the defendant throw the gun out the window, and then he went around to the front. Officer Atkins had been in the front, and he came around to the back at that point. So there was no – the place wasn't surrounded. The defendant was not – it had not been stabilized. How many exits were there? Pardon me, Your Honor? How many exits were there? As far as the record reveals, there were two. And there was an officer at the back and at least one and two officers, according to what you say at the front. What I'm trying to say, Your Honor, is that the back had not been stabilized, and it was not clear at that point the defendant could not have escaped out the back. The officers had not surrounded to the extent that the defendant had no means of escape. And I don't think the defendant, from his point of view or a reasonable person in his position, could have concluded at that point that he was seized. He was still resisting the authority of the officers. He had not submitted to that authority. There was no overwhelming show of force as there was in the Sixth Circuit case where, as the Court pointed out, there was an armored personnel carrier brought up to a situation where a deranged person was barricaded in a house. So this isn't a case where the authorities have made an overwhelming show of force or have completely stabilized the situation and prevented the defendant from escaping. How is it different from Al-Azawi? Al-Azawi is not as extreme as the Sixth Circuit case, but it's a similar kind of case where the defendant was in a trailer, the officers completely surrounded the trailer, bullhorns, you know, SWAT teams, that kind of thing, and ordered the defendant to come out and kneel down. So the only difference is that the officers were still running back and forth between the back and the front? Well, that is a significant difference in that there was no – the officers had not stabilized the situation. They did not have the situation under control to the extent that it would be reasonable to conclude that a seizure had been effected here. Even if there was a seizure, the defendant would have to show that the abandonment of the firearm resulted from that seizure. The cases are clear. This Court's decisions in Stevens and Gilman, which are cited in the brief, say that the fruit, the abandonment, has to be involuntary. It has to be a result of the illegal Fourth Amendment action. Well, if we assume there's a seizure here for the sake of argument, why do you throw the gun out? Well, presumably because he thought it would be able to – the police wouldn't see him or that he wouldn't be caught with it. Well, the result of the seizure was he threw the gun away. Well, no, there's an intervening voluntary act. He decided to – I'm trapped, so I throw the gun out. Well, it might be a normal reaction, but it is also a voluntary reaction or a voluntary intervening act that – What do you mean voluntary and intervening act? I mean that – It seems to me that it's as clear as the nose on our faces that he threw the gun out because the cops had him surrounded. Well, that may be, but – If it's an illegal seizure, he has to show that it's a fruit, and our position is that his voluntary abandonment – You mean that somehow he started watching a football game on television and said, well, I'm sitting on a couch and it's bothering me, so I'll throw it out the window? No, it was because the cops were all over the place. Right, but it was a voluntary decision to get rid of the gun. It wasn't – Voluntary decision to get rid of the gun. Yes, Your Honor. I mean, he – Because of the seizure. He opened the window and threw it out. Because of the seizure. Well, certainly the seizure predated it, but – So you're saying it has to be an involuntary decision? What do you mean – What would be an involuntary decision in the face of an illegal seizure? Well, I'm saying there has to be a more direct – It was volitional. It was volitional. There's no question about it. But it seems it was produced, it was caused by the seizure. I'm saying that when a suspect abandons something, property, a gun in this case, there has to be some more direct showing of causation between – How more direct could you get? Well, he went back into the house and went up the stairs and threw the gun out. He could have taken other steps. Like, for example? He could have hidden it. He could have decided that – tried to give it to his girlfriend who was in the house. I mean, there were a number of things. He could have just waited in the house and hoped that the police would go away. I mean, there were a number of things he could have done. But even if the court finds that causation between the seizure and the abandonment, the district court's decision can still be upheld on the ground that the officers had probable cause and exigent circumstances that authorized them to make that seizure at that time. And that's the basis for the district court's decision in this case. The probable cause and the exigent circumstances both arise out of the same set of facts. This was a person who was unfamiliar to the officers. These are officers, both of whom had three years working in this area. There were about 750 units in the area, and they testified they were very familiar with the residents. Would you agree that if, in fact, the place is surrounded, he's not free to leave, that the circumstances are no longer exigent? No, Your Honor, not in this circumstance because – Why? We're talking about three minutes from the time – at most three minutes from the time the officer saw him with a gun until the time he threw the gun out the window. So – So now we've got the guy in place, and what's the exigent circumstance that justifies going into the place? Well, the gun was thrown out before anybody – Yeah, I know that. I'm talking about, you know, we also have a statement that's sought to be suppressed as under Wong-Sun principles. So that enters into the mix, doesn't it? That's correct. I think to prevail on the gun, the defendant would have to show that the seizure that occurred, as he's painted it, that is the officers surrounding the house, was unjustified, was not supported by probable cause and exigent circumstances. And our position in the district court's position was that it was justified by probable cause and exigent circumstances. Did the officers have reason to believe nobody was in the residence into which he ran? They had no information either way on that until someone opened the door. So they did not know who lived in that apartment and didn't know if there were children present or anything like that. But they did know that an armed man had run into an apartment. They were aware of situations in the past where fleeing suspects had run into apartments where they were not residents. Did they testify that in their minds was this report two hours earlier of shots fired? Both Officers Coxson and Carolina testified that that was in their minds at the time, and they were aware of that. They were also aware that this was a high-drug area, that most of the crime committed in the Sunnydale Project was committed by nonresidents. They – it was 1230 in the morning. There were a number of people out and about. There was a group having a barbecue down at the end of the street, at the end of the block. They considered this to be a dangerous situation and one that they had to neutralize immediately by entering the apartment and seizing the defendant. Thank you, counsel. Your time has expired. Thank you.  Thank you, Your Honor. Mr. Wilson didn't have the benefit of being at the suppression hearing. Officer Coxson and Officer Adkins were in the back at the time that Mr. Hart tried to run back. That's at 254 to 256, 314 and 330 of the record. Assuming, arguendo, it was a seizure, why wasn't it reasonable under these circumstances, taken as a whole? Time, place, location, information in the minds of the officers, shots fired, gun seen, person running. Shots fired. Who's in the house. Shots fired two hours ago in a housing project would – if that's sufficient, then, you know, every place in the housing project is always going to be open for – You know what? You're probably right. For search and seizure, and that can't be the right rule. In terms of the – A free fire zone is a free fire zone. Not for the good people who live there. The – in terms of exigent circumstances, I think we've argued in the brief quite a bit about they had no real information of any exigency. They had no information anybody was in the apartment. They had no information he didn't belong there, no information anybody else was there. He'd only been guilty of – Did they have information that nobody was there? No. But the key – there's a very heavy burden on the government to prove exigent circumstances, and the fact that they have no information establishes that they don't meet the heavy burden, as does their own conduct in this case, which is completely inconsistent with any notion of exigency or great fear that Mr. Hart was going to do something with his weapon. I mean, if there was great fear that he was going to do something with his weapon, would Sergeant Carolina be standing there in full view on the front door, knocking on the door and shouting? Wouldn't they have searched for weapons when they got inside? Wouldn't they have asked for assistance? Wouldn't they have broken into the apartment if there was some great fear? No, they just stood there and knocked on the door. There wasn't any great exigency. If they'd broken in, we'd have another issue, right? That is correct, but at least they would have been consistent then with their argument that there was exigent circumstances. Here they're claiming exigent circumstances, but they don't even act like it. Your time has run. Do you have anything else? No, Your Honor. I thank the Court for its case. Thank you, counsel. The case then is ordered, submitted. Thank you both. We'll move on down the list to United States v. Antonio Galeano Flores.
judges: Trott, McKeown, Shadur